UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Complaint



------------------------------------------------------------X

Plaintiff: Kara Lee Hewett

against- :

Barclays Capital, Kramer Levin Naftalis & Frankel, Kevin Leblang; Allison Kramer Deeb

------------------------------------------------------------X

Plaintiff Witnesses if Jury Trial:

Dr. Lawrence Beck – Neurologist – Neurological Specialists

Dr. Sally Ciron – Primary Care Physician – Westport Family Health

Dr. Barbara Hewett – Clinical Psychologist

Dr. Mitchell Lester – Allergist – Fairfield County Asthma, Allergy & Immunology

Dr. Philip Simkovitz – Pulmonologist & Critical Care Physician

Dr. Richard Singer – Primary Care Physician – Westport Family Health

Employer Defendants:

Barclays Capital

Kramer Levin Naftalis & Frankel

Allison Kramer Deeb – Barclays Human Resources

Kevin Leblang –Attorney for Barclays Capital; Partner – Kramer Levin Naftalis &Frankel

## JURY DEMAND

**The New York City EEOC mediated a settlement to EEOC charge #842-2011-42100; however, this complaint requests the nullification (void) or rescission of these settlement agreements because of Kara Hewett's legal incapacity, contract errors, fraud, coercion, duress, and material misrepresentations by Barclays Capital that coerced Kara Hewett's consent to the settlement agreements. Prescription medications used for illness during the settlement agreement impaired her cognition and memory.**

A jury is requested for this complaint. Kara served notice to Defendants before the lawsuit for the tender back of proceeds, but Defendants have not provided the escrow account.

## REMEDY SOUGHT

The Plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs as follows:

- Nullification (Void) or Rescission of EEOC and Barclays Termination Contracts

- Intentional Refusal of Reasonable Accommodation for Six Months with Termination of the Basis of Predisposing Genetic Characteristics & Disability - $6,034,744 [Norville v. Staten Island University Hospital]

- Unlawful Collection of Predisposing Genetic Characteristics & Disability through Strip-Search Medical Examination without Bona Fide Occupational Qualification - $25,000,000

- Personal Injury from Gross Negligence - $5,000,000

- FMLA Violations for Double Six Months - $155,000

- Future Differential Medical Insurance Damages for Allergy Immunotherapy - $60,000 [4 vials annually for 5 Years]

- Future Differential Medical Insurance Damages for Intravenous Immunoglobulin Therapy - $1,200,000 [Monthly Treatment for 10 Years]

- Differential Compensation Wage Loss –$22,500 [Back Pay to Court Filing] and $300,000 [Front Pay for 10 Years]

- Promissory Estoppel Re-Hire at Barclays Capital as a Vice President in the Information Technology Department

## NEW YORK STATE STATUTE OF FRAUDS AND LACK OF MENTAL CAPACITY – CONTRACT NULLIFICATION (VOID) OR RESCISSION

The New York State Statute of Frauds [N.Y.CVP. Law Section 213] allows six years for the commencement of a lawsuit based on mistake or fraud. The New York State Statute of Limitations tolls, or pauses, under various situations including lack of mental capacity by the Plaintiff. When the Plantiff does not have the mental capacity to protect his rights, then the Plaintiff has three years to file suit after the Plaintiff regains his mental capacity. When the Plaintiff identified a lack of mental capacity for the contract in November, 2011, the Plaintiff notified the Defendants; however, the Defendants never evaluated the medical and legal issues.

## COERCION

Kara Hewett entered into the EEOC and Barclays contracts because material misstatements as fraud, insurance fraud, and fraudulent statements about re-hire coerced her consent.  She was disabled with a Yale Hospital referral when she settled.  *[Exhibit 1: Dr. Simkovitz Referral]* Because Barclays never provided the FMLA leave legal notice of rights, responsibilities and consequences, Kara Hewett entered the contract for financial support while she was disabled without employer medical insurance.  Because Barclays denied her the short-term disability insurance benefit, Kara Hewett entered the contracts because she lacked any disability income.

As an inhaler-dependent asthmatic whose medical condition was verified by Barclays pulmonologist, she was automatically qualified for FMLA leave.  Because Kara's lung infection was approved as a short-term disability by MetLife insurance in January, 2011, her March lung

infection was automatically qualified for short-term disability insurance as a continuation of disability by New York State disability statute.

Allison Kramer Deeb created her own medical leave and interfered with Kara's doctors' application into FMLA and short-term disability insurance. *[Exhibit 2: Email for Medical Exam]* When Allison Kramer Deeb fired Kara, her doctors were completely unable to provide necessary medical services because Kara lost medical insurance and disability income. The loss of FMLA and disability insurance coerced Kara's consent to the contracts, and she would not have signed the contract if she were on FMLA with short-term disability insurance income.

## VOID CONTRACT

Barclays settlement contracts would be void and unenforceable for many reasons.

1. The contract violates public policy and contravenes a statute proscribing the agreement with intentional violations of many federal and state laws.

2. The contract does not specifically describe the medical risks of the disability. The disability, asthma with recurrent lung infections, can be life-threatening with death or serious bodily injury.

3. The contract does not provide clear wording of the assumption of risks for death and serious bodily injury by the Plaintiff. The contract does not specifically release the Defendant from gross negligence, willful and wanton disregard or reckless acts.

4. The contract settlement occurred when the Plaintiff was in a weak bargaining position because she was ill with a referral to Yale Hospital for asthma and immunology contracts. Barclays fired her, cancelled her disability insurance, and withheld medical insurance through the refusal of FMLA leave which coerced her consent.

5.  The contract language does not clearly release the liability for negligent acts.

## Subject Matter Jurisdiction

This complaint arises from violations under Title I of the Americans with Disabilities Act of 1990, as codified, 42 U.S.C. § 12112-12117; Family Medical Leave Act 29 U.S.C.§ 825.114(a)(2) and 825.301(b); New York State Disability Benefits Law – New York State Workers Compensation Law § 204;  New York State Executive law Article 15 Human Rights law § 296.1.a, d, & e; New York State Statute of Frauds § 213; Gross negligence.

## Venue

The Southern District of New York is the proper venue for this lawsuit because of the diversity of citizenship between the Plaintiff (Connecticut) and the Defendants (New York).  The cause of action arose in Manhattan County at Barclays Capital office building which is located in the Southern District of NewYork at 1301 Avenue of the Americas; New York, New York 10019.

## Statement of Facts (Rule 8)

## LEGAL INCAPACITY AT SETTLEMENT & FMLA/DISABILITY QUALIFICATIONS

Kara Hewett, Dr. Beck, Dr. Ciron and Dr. Chervin provided ten reasons as evidence of the Plaintiff's legal incapacity at settlement and qualifications for FMLA or disability leave.

(1) In February, 2011 Dr. Chervin wrote a letter asking for reasonable accommodation during the "duration of his treatment" for allergy and asthma.  Dr. Chervin talked on the phone with Barclays Dr. Kalish. *[Exhibit 3: Dr. Chervin's Letter]*

(2) In a voice recording during April, 2011 Dr. Baskin discussed recurrent lung infections which were treated by health care providers for each of the four recurrent lung infections.  Dr. Ciron talked with Dr. Kalish about the last lung infection on the termination date.  Dr. Baskin also discussed and reviewed Kara's recent allergy test results and asthma medications.

(3) Inhaler-dependent asthmatics - United States Family and Medical Leave considers an inhaler-dependent asthmatic as a person who automatically qualifies for medical leave by statute because doctors closely monitor and treat respiratory illness with many office visits.  United States Allergy, Asthma and Immunology guidelines for asthmatics requires the verbal release of a patient at every encounter.  Typically the verbal medical release includes questions such as:

-Have you experienced any respiratory infection in the last 48 hours?

-Have you experienced any asthma symptoms in the last 48 hours?

-Have you experienced any fever in the last 48 hours?

-Have you experienced any negative reactions to recent medical treatments?

Barclays and their doctors never tested the control of Kara's asthma, obtained any medical release, or took any precaution for the treatment of her asthma or recurrent lung infections. An employee with recurrent lung infections cannot be released without medical clearance because FMLA law requires medical services. When I returned to Dr. Chervin after my termination for allergy treatments, I coincidentally was hoarse from a recent lung infection. Dr. Chervin understood the risks associated with asthma patients, refused treatment and recommended Dr. Lester who specializes in asthma, allergy and immunology.

(4) Yale Hospital Referral - Dr. Ciron disclosed "another medical condition [immunological]" that makes it difficult for Kara to clear infection. Barclays refused Dr. Ciron's instruction for one month accommodation and terminated Kara on the same date. *[Exhibit 4: Yale Referral]*

(5) EEOC Complaint - The EEOC complaint for reasonable accommodation described Kara Hewett's medical condition as severe, chronic asthma with three lung infections at the time of the complaint. Asthma exacerbations requiring multiple treatments and recurrent lung infections with incapacity automatically qualify for disability leave. *[Exhibit 5: EEOC Complaint]*

(6) Family Genetic History - In a voice recording Dr. Baskin required Kara's genetic information including the family medical history of her siblings, parents and grandparents. Kara's maternal grandmother died at the age of 39 with heart failure and asthma complications. Kara, her mother and sister have severe allergies to mold with a history of respiratory distress and infection. Dr. Baskin required the family medical history of her siblings and parents as additional genetic information of disability.

(7) Severe Allergy and Anaphylactic Shock - Kara and her family members have a history of severe allergy, respiratory distress and respiratory infection as severe allergic reaction and/or anaphylactic shock symptoms.

(8) Kara's Medical History to Childhood - In a voice recording Dr. Baskin required Kara's lifelong medical history including bronchitis and pneumonia to childhood. Dr. Baskin gathered details of each pneumonia instance. Kara has a history to childhood of pneumonia with lengthy infections such as a childhood infection with strep throat that progressed into strep bacterial pneumonia resulting in many months of illness. Kara's childhood pneumonia is clear evidence that indicates genetic predisposition. *[Exhibit 6: Dr. Baskin Voice Recording]*

(9) Reasons for RAST Blood Draw Allergy Tests - Kara experienced severe asthma attacks when antihistamines were stopped for three days in February, 2011 when Dr. Chervin attempted skin tests which resulted in blood draw tests for allergies. In February, 2012 her health improved and skin tests identified allergic response to everything - dust, grass, mold, trees, cats, dogs. Dr. Baskin discussed Kara's recent lung infections as potentially asthmatic bronchitis. *[Exhibit 6: Dr. Baskin Voice Recording]*

(10) Cognitive and Memory Impairment at Contract Settlement - The Plaintiff's pulmonologist referred the Plaintiff to Yale Hospital for intravenous immunoglobulin therapy which is an antibody infusion given to patients with recurrent lung infection. The Plaintiff had fear of her death. Dr. Beck, a neurologist, doubled the dosage of the tranquilizer which treated emotional distress on the same date, April 27, 2011 that the phone records show the Plaintiff's calls to Yale Hospital's Asthma, Allergy and Immunology Department.

Kara Lee Hewett v. Barclays Capital, Kramer Levin, et al

## DISABILITY HISTORY AT BARCLAYS

The medical facts around the pulmonary disability follow.  Kara Lee Hewett experienced lung infection on the following dates with the specified timeframe of antibiotics:

- November, 2010 - 5 days

-  December, 2010 - 5 days

- January, 2011 - 8 days

- March - April, 2011 - 17 days

Dr. Ciron requested reasonable accommodation for the lung infection through June 6, 2011, and Barclays terminated her on May 6, 2011.

## EMPLOYMENT DISCRIMINATION

In violation of New York State employment law against disability and genetic discrimination and collection of genetic and disability information, Barclays Capital required independent medical examinations with a pulmonologist, Dr. Martin Baskin, and a psychiatrist, Dr. Solomon Miskin, on threat of termination if Kara did not attend the medical examinations. [New York State Executive law Article 15 Human Rights law § 296.1.a, d, & e]  Based on the medical evidence, Barclays Capital was required by United States Family and Medical Leave Act and New York State Disability Benefit Law for the provision of medical services to Kara Hewett.  Instead Barclays fired Kara while disabled.  [Family Medical Leave Act 29 U.S.C.§ 825.114(a)(2) and 825.301(b); New York State Disability Benefits Law – New York State Workers Compensation Law § 204]

## New York State Executive law Article 15 Human Rights Law Section 296.1.a

For an employer...because of an individual's... disability, predisposing genetic

characteristics... to refuse to hire or employ or to bar or to discharge from employment such

individual or to discriminate against such individual in compensation or in terms, conditions or

privileges of employment.

## New York State Executive law Article 15 Human Rights Law Section 296.1.d

For any employer... to use any application for employment or to make any inquiry in

connection with prospective employment, ... which expresses directly or indirectly, any

limitation, specification, or discrimination as to ... disability, predisposing genetic characteristics

... or any intent to make any such limitation, specification, or discrimination unless based upon a

bona fide occupational qualification.

## New York State Executive law Article 15 Human Rights Law Section 296.1.e

For any employer... to discharge, expel or otherwise discriminate against any person

because he or she opposed any practices forbidden under this article.

## "Normal" Pulmonary Function Not "Bona Fide Occupational Qualification"

The New York State Human Rights law allows medical examinations for "bona fide

occupational qualification". The Americans with Disabilities Act allows medical examinations

including pulmonary exams if they are "job-related". Barclays never proved that "normal" lung

capacity was an essential part of her job. Barclays alleged that Ambient Air Quality Group

tested their air quality, and it met all indoor air quality standards. As a result Barclays does not

claim a toxic work environment either. Therefore the air quality at Barclays and her lung capacity would not be relevant or job-related for a pulmonary medical exam.

The New York State Human Rights law allows consideration of predisposing genetic information for "bona fide occupational qualification". Barclays never explained why her genetic pulmonary information is job-related. The Americans with Disabilities Act Executive Order 1-201b describes genetic monitor as "an examination of employees .... in the course of employment to exposure to toxic substances in the workplace." Again Barclays never explains how toxic substances are in the workplace which necessitated her genetic family history of pulmonary function.

## Medical Examination Pulmonary Practices

If Barclays did have a bona fide reason for a pulmonary exam, then the pulmonary exam should have been for her lung function without physical contact. Dr. Baskin should have never touched her or her breasts without consent. Pulmonary exams can be conducted with computerized equipment that tests inhalation and exhalation. Then the doctor administers oxygen and/or additional albuterol. The pulmonary tests are conducted again for inhalation and exhalation. The asthma control is the quantitative and qualitative test results between the before and after test results.

**The United States Family and Medical Leave Act Section 825.114(a)(2) defines a continuing treatment as:**

Period of incapacity of more than three consecutive days that also involves

(a) treatment two or more times by a health care provider

(b) treatment by a health care provider on at least one occasion which results in a regiment of continuing treatment under the supervision of the health care provider

**United States Family and Medical Leave - Employer Notice Requirement Section 825.301(b)**

Employer must provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining the consequences of a failure to meet the obligations.  As material misinformation Barclays never provided this written notice.

(i)  The leave will be counted against the employee's annual FMLA leave entitlement.

(ii) Any requirements for the employee to furnish medical certification of a serious health condition and the consequences of failing to do so including termination

(iii) Employee's right to substitute paid leave

(iv) Any requirement for the employee to make any premium payment

(v) Any requirement for the employee to present a fitness-for-duty certificate to be restored to employment

(vi) Key status employee

(vii) Employee's right to restoration to the same or an equivalent job upon return from leave

(viii) Employee's potential liability for payment of health insurance premiums paid by the employer

## LACK OF INFORMED CONSENT

The Barclays contract does not contain any informed consent agreement related to the risks of death or serious bodily injury and the assumption of these risks for the termination and settlement.   Asthma with recurrent lung infections is potentially life-threatening without proper medical care.  The Barclays contract does not state:

"I have a life-threatening disability.  Death or serious bodily injury is possible.  I assume all risks associated with my disability."

Doctors take the Hippocratic Oath that they will "never do harm to anyone".  In fact Kara's doctor, Dr. Ciron, was on the phone with Barclay's doctor, Dr. Kalish, on the termination date.  If Barclays could not accommodate, then Dr. Kalish could and should have discussed other medical options such as disability leave or FMLA.  Any informed consent agreement or Barclays contract should clearly state the 1) risks including death or serious bodily injury and 2) assumption of risks.

New York Public Health Laws, Section 2805-d defines a "lack of informed consent means the failure … to disclose to the patient such alternatives and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances."  If Barclays could not accommodate, then Dr. Kalish should discuss the risks inherent with asthma and lung infections including death or serious injury and allow necessary medical services.  If

Kara Lee Hewett v. Barclays Capital, Kramer Levin, et al

Dr. Kalish had discussed and allowed FMLA and disability insurance income, then Kara would not have signed the contract.  The lack of medical insurance from FMLA and the absence of short-term disability insurance income coerced Kara's consent to the contracts.

Informed consent is typical with any contract related to medical issues in which death or serious bodily harm can occur such as a surgery.  Kevin Leblang and Allison Kramer Deeb made the medical decision for Kara's doctors and her.  Barclays Human Resources and attorney should never interfere with Kara's doctors providing medical services for a life-threatening disability.

## FRAUD

## INSURANCE FRAUD

### New York State Disability Benefit Law - New York State Workers Compensation Law

### Section 204 - Disability during employment - Employer must provide an eligible employee with a disability benefit by New York State Disability Benefit Law.  As insurance fraud Barclays never provided this benefit to Kara Hewett while disabled.  Because Barclays denied Kara a short-term disability insurance benefit, Kara was coerced into the contract while disabled without disability income.

1.  Disability benefits shall be payable to an eligible employee for disabilities commencing after June 30, 1950, beginning with the eighth consecutive day of disability and thereafter during the continuance of disability, subject to the limitations as to maximum and minimum amounts and duration and other conditions and limitations in this section and in sections 205-206.  Successive periods of disability caused by the same or related injury or sickness shall be deemed a single period of disability only if separated by less than three months.  Kara's infection in January, 2011 was approved as Met Life short-term disability, and the subsequent infection would be in the timeframe for a continuation of the first disability by New York State law.

2.  The weekly benefit which the disabled employee is entitled to receive for disability commencing on or after May 1, 1989 shall be one half of the employee's weekly wage.

## FRAUD IN THE FACTUM & FRAUD IN THE INDUCEMENT

## PROMISSORY ESTOPPEL

Kevin Leblang and Allison Kramer Deeb signed a written contract with the New York City Equal Employment Opportunity Commission that protects Kara Hewett's rights to future hire based on the Americans with Disabilities Act if her health improves.  Kara Hewett requests re-hire at Barclays Capital as a Vice President in the Information Technology Department based upon Promissory Estoppel.  A successful promissory estoppel case requires:

"[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

All elements of promissory estoppel were met in this case:

1.  Kevin Leblang and Allison Kramer Deeb signed a contract with the New York City Equal Employment Opportunity Commission that requires Kara Hewett's rehire as a Vice President on the basis of the Americans with Disabilities Act if her health improved.  Specifically the Americans with Disabilities Act, Genetic Information Nondiscrimination Act prohibits discrimination by:

    To fail or refuse to hire any employee or otherwise discriminate against any employee with respect to the compensation terms, conditions, or privileges of employment of the employee, because of the genetic information with respect to the employee.

2.  Barclays Capital refused the request of reasonable accommodation for Kara Hewett by her doctor, Dr. Ciron, on May 6, 2011, and Barclays terminated her the same day.  The EEOC mediator who was a cancer survivor explained to Kara that her federal disability rights were

---

protected.  As a result, Kara could be rehired as a Vice President at Barclays Capital if her health improved.  Kara Hewett relied on this written commitment, and she requested rehire as a Vice President at Barclays in November, 2011 when she was healthier and could work without a reasonable accommodation.

3.  Kara requests re-hire at Barclays because other employers have retaliated against her because of her previous opposed disability discrimination at Barclays.  Graham Capital withdrew a verbal offer citing questions about Barclay's termination.  J. P. Morgan ceased interviews after learning of Barclay's termination of Kara while disabled.  Kara has not found another employer with similar medical and disability insurance benefits, and her compensation is less than at Barclays.  Barclays re-hire as a Vice President is the fairest equitable remedy.

## CONTRACT BACKGROUND AND ERRORS

The facts and circumstances preceding the Barclays termination contract are complex.

## FIDUCIARY DUTY

At the contract settlement Allison Kramer Deeb was a Vice President who represented Barclays Capital Human Resources, and Kevin Leblang represented Barclays Capital as an attorney who was a partner at the law firm Kramer, Levin, Naftalis & Frankel. The Barclays termination contract was executed on a fax letterhead for Kramer Levin. As such they had fiduciary duties to Barclays Capital including a duty of care, a duty to avoid fraud, and a duty to avoid gross negligence.

When Kara entered the contracts she believed that Allison and Kevin were trustworthy, honest people who would not lie to the EEOC mediator or Kara. Allison and Kevin told them and signed an agreement that no retaliation or discrimination would occur against Kara because of her disability, and she believed them completely

The judicial issue is the breach of this fiduciary duty. Specifically what knowledge Allison Kramer Deeb and Kevin Leblang possessed about Kara Hewett's health and medical condition at the termination and settlement agreement. At this time Kara believes that they both knew of Kara's physical and mental disability based on independent medical examinations, exploited her medical condition, refused the instruction of her doctor and terminated her on the same date. Substantial physical and/or mental impairment was foreseeable on that date. She does not believe that they acted with willful malice or a premeditated desire to physically or mentally harm Kara. Rather Kara was injured in the course of fiduciary duty.

Kara Hewett believes that Allison Kramer Deeb and Kevin Leblang breached their fiduciary duties as follows:

- Breach of Duty of Care – As representatives of Barclays they had a duty of care that they would not terminate Kara when she could suffer physical harm or serious bodily injury. They would not engage in any action that could cause death, serious harm, or a substantial reduction in Kara's physical or mental efficiency.  When Kara was terminated, she lost necessary asthma and immunology services and suffered additional emotional distress from the unemployment that was treated with a tranquilizer, Lorazepam, until November, 2011.  Dr. Beck, a neurologist, identified both the tranquilizer and emotional distress as causes of cognitive and memory impairment.
- Exploited Legal Incapacity of Plaintiff at Termination and Settlement
- Fraud in the Inducement and Fraud in the Factum
- Gross Negligence

## VOID CONTRACT

Barclays settlement contracts would be void and unenforceable for many reasons.

1. The contract violates public policy and contravenes a statute proscribing the agreement with intentional violations of many United States and New York State laws.

New York State Disability Benefit Leave law mandates an employer disability benefit for an eligible employee. The United States Family and Medical Leave Act requires medical leave and insurance for an employee with a serious medical condition. At the time of the settlement the Plaintiff was an inhaler-dependent asthmatic with a referral to Yale Hospital for medical care which would qualify for disability income and FMLA.

New York State Human Rights Law and the Americans with Disabilities Act prohibit the termination or refusal to rehire an employee because of a disability, predisposing genetic characteristics or opposing discrimination practices.

2. The contract does not specifically describe the specific medical risks of the disability or Kara's rights and responsibilities under FMLA or disability leave. The disability, asthma with recurrent lung infections, can be life-threatening with death or serious bodily injury.

3. The contract does not provide clear wording of the assumption of risks for death and serious bodily injury by the Plaintiff. The contract does not specifically release the Defendant from gross negligence, willful and wanton disregard or reckless acts.

The New York Court of Appeals, in Gross v. Sweet, addressed the issue of the general enforceability of releases and waivers. The Gross court explained that the intention of the parties must be expressed in unmistakable language for the exculpatory clause to insulate a party from liability for his own negligent acts. For a release to be enforceable, it must be plainly and precisely apparent that the limitation of liability extends to negligence or fault of the party attempting to shed his ordinary responsibility.

4. The contract settlement occurred when the Plaintiff was in a weak bargaining position because she was ill with a referral to Yale Hospital for asthma and immunology services. Barclays fired her, cancelled her disability insurance, and withheld medical insurance through the refusal of FMLA leave which coerced her consent to the contract.

5. The contract language does not clearly release the liability for negligent acts.

A release and waiver that exculpates a defendant from liability for negligent acts may be declared void where disparity in bargaining power of the parties would render enforcement unconscionable. In addition, a release is void if it violates public policy or contravenes a statute proscribing such agreement. For example, in Gilkeson v. Five Mile Point Speedway, Inc., the plaintiff purchased a ticket from the defendant for entry into an automobile racetrack and paid an additional fee for specific entry into the pit area. To gain access to the pit area, the plaintiff was required to sign a Release and Waiver of Liability Agreement. Plaintiff signed the agreement and indicated on the document that he was a member of the pit crew for his friend who was racing. As plaintiff watched the race, a collision occurred between two cars, and one of the cars lost control, striking the plaintiff. Defendant moved for summary judgment, alleging that plaintiff was barred from recovery because of the release and waiver.

Kara Lee Hewett v. Barclays Capital, Kramer Levin, et al

The court denied the motion on two grounds. First, the release contravenes a statute proscribing such agreement. Under N.Y. General Obligations Law § 5-326, any release and waiver agreement is void as being against public policy if the owner or operator of the facility receives a fee for the use of the facility. Since the plaintiff had paid a fee for the ticket and an additional fee for the pit admission, the release was void.

However, even if there was no statutory provision voiding the release, the court still would have voided the release because of its wording. The court found that the release made no reference to specific risks inherent in being a spectator in the pit area, but merely referred to assuming the risk of negligence of the defendant, which may cause injury or death. The court concluded that plaintiff was not apprised of the risks involved in the situation, and therefore could not be considered to have assumed them.

In the current case the Barclays contract does not clearly describe the risks associated with asthma and recurrent lung infections and the medical options including FMLA or disability leave. Moreover Barclays' doctor, Dr. Kalish, did not discuss these topics with Kara's doctor, Dr. Ciron, on the termination date. Neither Kara nor Dr. Ciron was informed of the medical options for Kara's medical condition.

## GROSS NEGLIGENCE

**Allison Kramer Deeb of Barclays Human Resources acted with gross negligence when she terminated Kara Hewett following independent medical examinations and refused the verbal and written instructions of Dr. Sally Ciron for reasonable accommodation.** Allison's actions exhibit an intentional and wanton disregard for Kara's health and safety. Before the termination date Allison Kramer Deeb ordered Kara Hewitt to independent medical exams with a pulmonologist and a psychiatrist using a threat of termination if Kara did not participate.

The pulmonologist, Dr. Martin Baskin, conducted a physical medical exam, reviewed four years of Kara's medical records for lung infections, asthma and allergies, and inquired about her family medical history as genetic information. Specifically Kara's maternal grandmother, Helen Burton, died at the age of 39 from heart failure with asthma complications. Kara experienced seven months of recurrent lung infections with severe asthma attacks in the winter of her 39th year. Barclays' psychiatrist diagnosed Kara with "emotional distress from illness". Allison Kramer Deeb displayed gross negligence with an intentional, wanton disregard for Kara's health and safety, and Allison terminated Kara two weeks after these medical examinations on May 6, 2011 when Dr. Ciron requested return to work with one month reasonable accommodation. Four days before the termination on May 2, 2011 Dr. Simkovitz referred Kara to Yale Hospital for further evaluation of low immunoglobulin g.

On May 6, 2011 Allison Kramer Deeb terminated Kara's employment when Dr. Ciron requested return to work with one month reasonable accommodation. On May 2, 2011 Dr. Simkovitz, Kara's pulmonologist, referred her to Yale Hospital for intravenous immunoglobulin therapy. Dr. Simkovitz recommended further evaluation of the immunological deficiency from

Kara Lee Hewett v. Barclays Capital, Kramer Levin, et al

Dr. Kantor and Dr. Askenase at Yale New Haven Hospital. On the termination date Dr. Ciron talked on the phone with Dr. Kalish at Barclays, and Dr. Ciron's return to work letter fully disclosed both the respiratory and immunological condition with a description of "another medical condition (immunological)" that made it difficult for "clearing infection." Because Kara used an antibiotic over seventeen days for the lung infection, Dr. Simkovitz could not determine with precise certainty the underlying immunological condition until the antibiotic cleared Kara's system after another six to eight weeks or July, 2011.

**Allison Kramer Deeb's termination denied necessary medical care which caused Kara additional physical and emotional harm.** As a result Barclays Capital who employed Allison Kramer Deeb is responsible for damages related to gross negligence that exhibits an intentional, wanton disregard for Kara Hewett's health and safety.

Finally Barclays' doctors acted with gross negligence because they did not evaluate and disclose the inherent risks of asthma and recurrent lung infections including death or serious bodily harm. As a result Kara was denied necessary medical services. Doctors take the Hippocratic Oath that they will "never do harm to anyone". Kara's doctor, Dr. Ciron, was on the phone with Barclay's doctor, Dr. Kalish, on the termination date. If Barclays could not accommodate, then Dr. Kalish could and should have discussed other medical options such as disability leave or FMLA. Any informed consent agreement or Barclays contract should clearly state the 1) risks including death or serious bodily injury and 2) assumption of risks.

New York Public Health Laws, Section 2805-d defines a "lack of informed consent means the failure ... to disclose to the patient such alternatives and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances." If

Kara Lee Hewett v. Barclays Capital, Kramer Levin, et al

Barclays could not accommodate, then Dr. Kalish should discuss the risks inherent with asthma and lung infections including death or serious injury and allow necessary medical services. If Dr. Kalish had discussed and allowed FMLA and disability insurance income, then Kara would not have signed the contract. The lack of medical insurance from FMLA and the absence of short-term disability insurance income coerced Kara's consent to the contracts.

**REMEDY SOUGHT**

The Plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs as follows:

- Nullification (Void) or Rescission of EEOC and Barclays Termination Contracts
- Intentional Refusal of Reasonable Accommodation for Six Months with Termination of the Basis of Predisposing Genetic Characteristics & Disability - $6,034,744 [Norville v. Staten Island University Hospital]
- Unlawful Collection of Predisposing Genetic Characteristics & Disability through Strip-Search Medical Examination without Bona Fide Occupational Qualification - $25,000,000
- Personal Injury from Gross Negligence - $5,000,000
- FMLA Violations for Double Six Months - $155,000
- Future Differential Medical Insurance Damages for Allergy Immunotherapy - $60,000 [4 vials annually for 5 Years]
- Future Differential Medical Insurance Damages for Intravenous Immunoglobulin Therapy - $1,200,000 [Monthly Treatment for 10 Years]
- Differential Compensation Wage Loss –$22,500 [Back Pay to Court Filing] and $300,000 [Front Pay for 10 Years]
- Promissory Estoppel Re-Hire at Barclays Capital as a Vice President in the Information Technology Department

Kara Lee Hewett v. Barclays Capital, Kramer Levin, et al

**Signature**

*Kara Hewett*          *May 4, 2012*

Kara Lee Hewett

6 Silent Grove North

Westport, Connecticut 06880

(203) 233-5620

## **Exhibits**

Exhibit 1: Dr. Simkovitz Referral

Exhibit 2: Email for Medical Exam

Exhibit 3: Dr. Chervin's Letter

Exhibit 4: Yale Referral

Exhibit 5: EEOC Complaint

Exhibit 6: Dr. Baskin Voice Recording

Philip Simkovitz, M.D.

OFFICE VISITS

Name _Hewett, Kara_                SS# _____   Page# ____

Address _____

Phone (home) _____ (work) _____ Date of birth _5/6/71_

Drug allergies _____

| DATE | NOTES | HT | WT | BP | P | T |
|------|-------|----|----|----|----|----|

5/2/11  Pt to pick up letters for 3 docs, copies made for us. pt

7/4/11                                      wt 115

Has been off work @ 3 mos                    Some
                                             meds

Breathing better

Never went to see — because was
immunologist                    not sure/certain
                                about previous
                                IgG

100/60

heart 5 @

lungs clear on _ cellular

well clear

CV  S₁ S₂

Imp  Hypo IgG
     Asthma ?

Rx  Continue current Rx
    Recheck SPEP @ pt request
    PFT & others, etc

---

Peoples Medical
Respiratory & Home Medical Equipment

Phone:      203.944.0332
Toll Free:  800.993.8446
Fax:        203.230.3716

Philip Simkovitz, M.D.

**OFFICE VISITS**

Name Hewett, Kara                    SS# _____ Page# _____

Address _____

Phone (home) _____ (work) _____ Date of birth 5/06/71

Drug allergies _____

| DATE | NOTES | HT | WT | BP | P | T |
|------|-------|----|----|----|----|----|
| 4/25/11 | | | 117 | Med | | |
| | | | | Lorezpan 1mg | | |
| | | | | Singular | | |
| | Pf  s̄  change | | | | | |
| | R.E.  s̄  change | | | | | |
| | Imp  ① Hypogammaglobulinemia | | | | | |
| | Plan  Given  3 options | | | | | |
| | a) Repeat SPEP  in  6-8 weeks | | | | | |
| | b) Consider 6 mos trial | | | | | |
| |      of I.V. Ig | | | | | |
| | c) Immunologist  consult | | | | | |
| | Councilling  Tave  15 mins | | | | | |
| | F/u  4 mos. | | | | | |
| |         P.S. | | | | | |

**Peoples Medical**
Respiratory & Home Medical Equipment

Phone:       203.944.0332
Toll Free:  800.993.8446
Fax:         203.230.3716

PHILIP SIMKOVITZ
5520 PARK AVENUE
SUITE 202
TRUMBULL, CT  06611



Clinical Laboratory Partners LLC

CT LICENSE CL-0385 / CLIA# 07D0094387

129 Patricia M. Genova Dr.
Newington, CT 06111
1-800-286-9800
860-696-8020

| | Patient Name |
|---|---|
| Physician: **PHILIP SIMKOVITZ, MD** | **HEWETT,KARA L** |

| | Sex: | Date of Birth: | Age: |
|---|---|---|---|
| Accession: AK583364 | FEMALE | 05/06/1971 | 39 |
| Req. #: | | | |
| Collected: **04/15/2011  14:04** | | | |
| Reported: 04/22/2011  14:38 | Patient Phone: | Patient ID #: | MED. REC.# |
| | 203-233-5620 | AK583364 | |

| REQUEST | RESULT | UNITS | NORMALS | TEST LO |
|---|---|---|---|---|

**Non-Fasting Specimen**          **FINAL REPORT**

**Alpha-1 Antitrypsin (AAT) Mutation Analysis (continued)**
the analytical performance of the test.
CLINICAL INDICATION              NOT GIVEN
REFERRING PHYSICIAN              NOT GIVEN
Results Received                04/22/11
Reference lab accession: 46588471

Test performed by:
         Quest Diagnostics Nichols Institute
         33608 Ortega Hwy
         San Juan Capistrano, CA 92675
         Phone:  800-553-5445

Director:  Jon M. Nakamoto, M.D.


Immunoglobulin G (IgG) Subclasses
IgG, Serum                       602     L
   Reference range: 694 to 1618
   Unit: mg/dL
IgG 1                            355     L
   Reference range: 382 to 929
   Unit: mg/dL
IgG 2                            191     L
   Reference range: 241 to 700
   Unit: mg/dL
IgG 3                             30
   Reference range: 22 to 178
   Unit: mg/dL
IgG 4                            17.8
   Reference range: 4.0 to 86.0
   Unit: mg/dL

Electrophoresis, Protein, Serum (SPEP)
Albumin                    4.8       g/dL          3.5-5.2
Alpha 1 Globulin           0.2       g/dL          0.1-0.3
Alpha 2 Globulin           0.8       g/dL          0.5-1.1
Beta Globulin              0.6       g/dL          0.6-1.2

CONTINUED....

HEWETT,KARA L                    Route: 9000                 Page: 3

PHILIP SIMKOVITZ,
5520 PARK AVENUE
SUITE 202
TRUMBULL, CT  06611

**Clinical Laboratory Partners** LLC

CT LICENSE CL-0385 / CLIA# 07D0094387

129 Patricia M. Genova Dr.
Newington, CT 06111
1-800-286-9800
860-696-8020

| | Patient Name |
|---|---|
| | **HEWETT, KARA L** |

Physician: **PHILIP SIMKOVITZ, MD**
Accession: **AK583364**
  Req. #:
Collected: **04/15/2011 14:04**
Reported: **04/22/2011 14:38**

| Sex: | Date of Birth: | Age: |
|---|---|---|
| **FEMALE** | **05/06/1971** | **39** |

| Patient Phone: | Patient ID #: | MED. REC.# |
|---|---|---|
| **203-233-5620** | **AK583364** | |

| REQUEST | RESULT | UNITS | NORMALS | TEST LO |
|---|---|---|---|---|

**Non-Fasting Specimen**          **FINAL REPORT**

**Electrophoresis, Protein, Serum (SPEP) (continued)**

| | | | |
|---|---|---|---|
| Gamma Globulin | 0.6  L | g/dL | 0.7-1.5 |
| Protein, Total | 6.9 | g/dL | 6.3-8.3 |
| Electrophoresis Interpretation: | Normal | | Normal |
| | | | |
| Immunoglobulin E (IgE) | 14 | kU/L | <115 |

**ABNORMAL SUMMARY**

| | | | | |
|---|---|---|---|---|
| Immunoglobulin G (IgG) Subclasses | | | | |
|   IgG, Serum | 602 | L | | |
|   IgG 1 | 355 | L | | |
|   IgG 2 | 191 | L | | |
| Electrophoresis, Protein, Serum (SPEP) | | | | |
|   Gamma Globulin | 0.6 | L | g/dL | 0.7-1.5 |

**PLEASE NOTE:** The abnormal summary is supplied as a tool for identifying abnormal results.  All results must still be reviewed as some abnormal results will not be included due to their interpretative or textual nature.

CC: BRADFORD CHERVIN, MD
    RICHARD SINGER, M.D.

Testing Location(s):
    Clinical Laboratory Partners - 129 Patricia M. Genova Drive    Newington, CT 06111 860-696-8020 CLIA #:07D0094387 CL-0:
    Bradford Sherburne, MD Medical Director
20 Quest Diagnostics, Chantilly - 14225 Newbrook Drive PO Box 10841   Chantilly, VA 20153  CLIA #:49D0221801
    Nathan Sherman MD Medical Director

Phlebotomy charge applied

| HEWETT, KARA L | Route: 9000 | Page: 4 (las |
|---|---|---|

EXHIBIT 2



Gmail

Search Mail    Search the Web    Show
                                  Create

It looks like you have enabled Internet Explorer
Gmail works best if you turn this off.  Learn how

**Mail**
Contacts

Tasks

Compose mail

**Inbox (15)**
Buzz
**Important**
**Sent Mail**
Drafts
**Spam (49)**

**AVS Examples (6)**
**EEOC (12)**
**French Lessons (2...**
Hope Pictures
**Personal (3)**
**Pictures (4)**
**Recruiter Contacts ...**
Resume
Taxes
Travel
6 more ▾

**Chat**

Search, add, or invite

kara hewett
Set status here

**Invitations**
(1/2)                    [<] [>]
memanojgreat@gmail.com
wants to be able to chat
with you. Okay?
[yes]  [no]

Call phone
Lin Lin
dberenboym@gmail.com
Away since 4:57 PM (...
Dev Ashish
Glenn LeMoine
J M
Voice Only

Family Medical Services - www.ouhsc.edu/health - From Jenny T. Le, M.D. Board- Cer

**Archive**   Spam   Delete        Move to Inbox      Labels        M

## I"LL BE AT THE DOCTORS APPT ON MONDAY

kara hewett to allison.kramer.                    show details Apr

Allie

I completely disagree with the approach that Barclays has taken.  As
you are telling me that I'll be terminated if I do not appear on
Monday, I'll be at the doctor's appointment on Monday.  I'll bring
four years of medical history and tissue samples from the latest
bronchitis incident.

Kara

Reply      Forward

**Family Medical Services - From Jenny T. Le, M.D. Board-**
Certified Family Medicine Practice.
www.ouhsc.edu/health

**Archive**   Spam   Delete        Move to Inbox      Labels        M

https://mail.google.com/mail/?ui=2&view=bsp&ver=ohhl4rw8mbn4                    11/26/2011

EXHIBIT   2

 **BARCLAYS CAPITAL**

200 Park Avenue
New York NY 10166
USA

Tel +1 (212) 412 4000

**Via E-Mail & Federal Express**

Kara Hewett
6 Silent Grove North
Westport, CT 06880

March 31, 2011

Dear Kara:

I am in receipt of your five voicemail messages, seven e-mails, and facsimile sent between last night and this afternoon and am writing in response.

Please understand, as explained in my letter dated March 30, the medical documentation that you submitted signed by Dr. Chervin is not sufficient for Barclays to conclude that the only reasonable accommodation in this situation is permanent telecommuting with the additional parameters you have set out. Dr. Chervin does not identify or explain the physical limitation(s) that currently exist, in what manner and to what extent your physical limitation(s) prevent you from working at your office for any portion or all of the day (but do not prevent you from working at your home from 9am to 6pm) or what is the expected duration of your physical limitation(s). Nor does Dr. Chervin provide his medical opinion that it is medically necessary that you work exclusively from your home and limit your work time to Monday through Friday from 9:00 a.m. to 6:00 p.m. At the present time, Barclays believes it necessary to have you examined by an independent medical provider (at no cost to you) before it can determine what accommodation (if any) is necessary or reasonable under the circumstances.

From your correspondence, we believe the following is clear: First, you refuse to allow Barclays' doctor, Dr. Kalish, to engage in a discussion with Dr. Chervin in order to obtain more information relating to your requested accommodation as Barclays has requested. Second, you refuse to allow an independent medical provider to examine you as requested by Barclays in order to assess the nature, extent and expected duration of your physical limitation(s) (if any).

Under the current circumstances, Barclays cannot provide you with your requested accommodation of telecommuting from Monday through Friday from 9:00 a.m. to 6:00 p.m.

Your emails stating that you will be telecommuting beginning Monday are very concerning. Barclays may appropriately ask you to cooperate in the process of assessing your physical limitation(s) (if any) before it determines what accommodation (if any) is necessary and reasonable. You may not unilaterally insist that your requested accommodation is appropriate and commence working pursuant to that accommodation.

In light of the fact that your accommodation request is not approved, if you proceed with working from home commencing on April 4th, you will be acting in violation of Barclays' policies and procedures and may be subject to discipline, up to and including termination.

If you intend to return to work full-time in Barclays' offices, per my letter of yesterday, we require: (1) confirmation from an independent medical provider that you are physically fit to return to the workplace; and (2) confirmation from an independent mental health provider that you are mentally fit to return to the workplace.

Please confirm no later than tomorrow, April 1, 2011 at 5:00 PM EST if you intend to schedule these two Independent Medical Evaluations and I will have a representative from Juris Solutions, a company that specializes in such services, contact you directly to schedule an appointment for the physical fitness assessment and the mental health assessment. Again, as I stated yesterday, Barclays will pay for the full costs associated with these visits. We will provide you with a one-week paid leave of absence so that you may complete these assessments. During this time, however, you will not be allowed to work remotely or remotely log onto Barclays' computer systems. If these independent medical providers

Barclays Capital Inc.
Barclays Bank PLC, New York Branch

believe that you could return to work with a reasonable accommodation, we will, of course, consider such an accommodation.

Moreover, in addition to your eligibility to apply for a leave of absence and file a claim under the state workers compensation system, please note that Barclays offers an Employee Assistance Program (EAP) to its employees to discuss any concerns that you may have.  In order to access these services, you may call the toll free number 1-800-448-4358 which is available to you 24 hours a day.  You may also log onto our EAP provider's website at www.harrisrothenberg.com.  The user name is Barclays and the password is eap.

Finally, it is your right to seek legal counsel from either a private attorney or a government attorney.  If you choose to do so, please have the attorney contact me and I will put that attorney in touch with Barclays' legal counsel.

Please do not hesitate to call me if you would like to discuss the above.


Regards,

Allison Kramer Deeb
Human Resources

EXHIBIT 3

# EAR NOSE & THROAT, ALLERGY,
## & FACIAL PLASTIC SURGERY SPECIALISTS, LLC

Otolaryngology • Head & Neck Surgery • Allergy
Bradford S. Chervin, M.D.

Audiology
Linda Teich Schulman, M.S.,CCC-A

15 February, 2011

To Whom It May Concern;

Re: Kim Hewitt

Please permit Ms. Hewitt to
adjust her work schedule
to daytime rather than
evenings. She is undergoing
treatment for a chronic
medical condition and
we are trying to regulate
her diurnal cycle. Thank you,

2600 Post Road • Southport, CT 06890 • Tel: 203.256.3338 • Fax: 203.256.3346
www.DrBChervin.com

*EXHIBIT 4*

**Patient:** HEWETT, KARA L    **DOB:** 05/06/1971    **Age:** 40 Y    **Sex:** Female
**Phone:** 203-233-5620    **Primary Insurance:** BLUE CROSS BLUE SHIELD PPO    **Payer ID:** 1420
**Address:** 6 SILENT GROVE, WESTPORT, CT-06880
**Lab Req No:** 17874.190350    **Chart No:** 17874
**Provider:** Sally Ciron, MD    **Encounter Date:** 05/06/2011

## Subjective:

**Chief Complaint(s):**

ESTABLISHED PATIENT, PT NEEDS A RETURN TO WORK FORM AND A CHECK UP FOR TODAY OR ELSE SHE WILL BE FIRED FROM HER JOB, PT HAS A LOT OF BRONCHIAL ISSUES , IS STILL HAVING ONGOING TIGHTNESS IN HER CHEST FROM ASTHMA, PT NEEDS REFILL ON HYDROMET.

**HPI:** ▽

MISCELLANEOUS NEW COMPLAINT

PT NEEDS A LETTER TO RETURN TO WORK- TO BE LIMITED TO DAYTIME SCHEDULE AND SEATED IN A SEPARATE AREA FROM SICK CO-WORKERS. HAS NOT BEEN TO WORK SINCE MARCH 24.

HAS HAD 4 EPISODES OF BRONCHITIS OVER THE PAST FEW MONTHS AND HAS SEEN A SPECIALIST FOR THIS. SHE WAS DIAGNOSED WITH ASTHMA AND IS CURRENTLY USING VENTOLIN, PILMICORT, NASACORT AQ, ZYRTEC AND HYDROMET FOR HER COUGH AT NIGHT. SHE IS CURRENTLY IN THE PROCESS OF BEING SENT TO YALE FOR FURTHER TREATMENT OF LOW ANTIBODIES.

WOULD ALSO LIKE A REFILL ON HYDROMET AS THIS HELPS HER WITH HER COUGH AT NIGHT.

**Current Medication:**

Pulmicort Flexhaler 180 mcg/inh 180 mcg 2 times a day, Ventolin HFA CFC free 90 mcg/inh 2 puff(s) 4 times a day, Lutera 20 mcg-100 mcg 1 tab(s) once a day, Ambien 10 mg 1 tab qhs, Nasacort AQ 55 mcg/inh 2 spray(s) once a day, Zyrtec 10 mg 1 tab qd

**Medical History:**

None.

**Allergies/Intolerance:**

pollen - sneezing, Erythromycin

**ROS:** ▽

## Objective:

**Vitals:**

Temp 98.3

**Past Results:**

**Examination:** ▽

Urgent Care Examination

General Appearance: NAD, pleasant.  CARDIO-PULMONARY HEART SHOWS A, RRR W/O MURMUR, LUNGS CLEAR BILATERALLY.

## Assessment:

**Assessment:** ▽

Cough variant asthma - 493.82 (Primary)

## Plan:

**Treatment:**

Page 1 of 2

Cough variant asthma
Refill Hydromet syrup, 1.5 mg-5 mg/5 mL, orally, 4 oz, 5 mL, at bedtime as needed for cough
WROTE LETTER FOR WORK BUT ADVISED PT TO F/U WITH DR. SINGER FOR FURTHER LETTER FOR WORK.

**Procedures:**
**Immunizations:**
**Diagnostic Imaging:**
**Lab Reports:**
**Next Appointment:**
prn,DR. CIRON- electonic signature

## Billing Information:
**Visit Code:**
99213 OFFICE VISIT, EST PT, EXPANDED.
**Procedure Codes:**

*EXHIBIT 5*

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination.** When we receive this form, we will review it to determine EEOC coverage. **Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)**

### 1. Personal Information

Last Name: **HEWETT**   First Name: **KARA**   MI: _____

Street or Mailing Address: **6 SILENT GROVE N**   Apt or Unit #: _____

City: **WESTPORT**   County: **FAIRFIELD**   State: **CT**   Zip: **06880**

Phone Numbers: Home: (___) _____   Work: (**203**) **233 - 5620**

Cell: (**203**) **233 - 5620**   Email Address: _____

Date of Birth: **May 6, 1971**   Sex: ☐ Male ☒ Female   Do You Have a Disability? ☒ Yes ☐ No

**Please answer each of the next three questions.**   i. Are you Hispanic or Latino? ☐ Yes ☒ No

ii. What is your Race?   Please choose all that apply. ☐ American Indian or Alaskan Native   ☐ Asian   ☒ White
☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? **UNITED STATES**

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: _____   Relationship: _____

Address: _____   City: _____   State: _____   Zip Code: _____

Home Phone: (___) _____   Other Phone: (___) _____

### 2. I believe that I was discriminated against by the following organization(s): (Check those that apply)

☒ Employer   ☐ Union   ☐ Employment Agency   ☐ Other (Please Specify) _____

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name: **BARCLAYS CAPITAL**

Address: **200 PARK AVENUE**   County: _____

City: **NEW YORK**   State: **NY** Zip: **10066** Phone: (**212**) **526 - 7000**

Type of Business: **BANKING**   Job Location if different from Org. Address: **1301 AVENUE OF AME**

Human Resources Director or Owner Name: **KIM BAKER**   Phone: (**212**) **526 - 7000**

**Number of Employees in the Organization at All Locations:** Please Check (✓) One
☐ Fewer Than 15   ☐ 15 – 100   ☐ 101 – 200   ☐ 201 – 500   ☒ More than 500

### 3. Your Employment Data (Complete as many items as you are able.) Are you a federal employee? ☐ Yes ☒ No

Date Hired: **March 22, 2010** Job Title At Hire: **Vice President**

Pay Rate When Hired: **155,000**   Last or Current Pay Rate: **155,000**

Job Title at Time of Alleged Discrimination: **Vice President** Date Quit/Discharged: _____

Name and Title of Immediate Supervisor: **YURI KUZMYCZ**

**If Job Applicant,** Date You Applied for Job _____   Job Title Applied For _____

1

**4. What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☐ Race ☒ Sex ☐ Age ☒ Disability ☐ National Origin ☐ Religion ☐ Retaliation ☐ Pregnancy ☐ Color (typically a difference in skin shade within the same race) ☐ Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing   ii. family medical history   iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify:_____

If you checked genetic information, how did the employer obtain the genetic information?_____

_____

Other reason (basis) for discrimination (Explain): _PLEASE   SEE   ATTACHED_

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. Please attach additional pages if needed.
*(Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)*

A. Date: _March 11, 2011_ Action: _Denial of Reasonable Accommodation for a Disability_

Name and Title of Person(s) Responsible: _Kim Baker, Human Resources_

B. Date: _Various_ Action: _Sexual Harassment + Discrimination on the Basis of Gender & Disability_

Name and Title of Person(s) Responsible _Steve Anderson, Yuri Kuzmycz, Dave Banks_

**6. Why do you believe these actions were discriminatory?** Please attach additional pages if needed.
_Yes. Please See attached._

_____

**7. What reason(s) were given to you for the acts you consider discriminatory?   By whom?   His or Her Job Title?**
_Please See attached_

_____

**8. Describe who was in the same or similar situation as you and how they were treated.** For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on.  Use additional sheets if needed.

Of the persons in the same or similar situation as you, who was treated *better* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|
| A. Yuri Kuzmycz | White, Male, 35, non-disabled | Vice President | better compens training, |
| B. David Banks | White, male, non-disabled | Vice President | better compens training |

2

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

A. _____

_____

B. _____

_____

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

A. _____

_____

B. _____

_____

Answer questions 9-12 <u>only</u> if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.

9. **Please check all that apply:**
   - ☑ Yes, I have a disability
   - ☐ I do not have a disability now but I did have one
   - ☐ No disability but the organization treats me as if I am disabled

10. **What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

breathing - severe asthma & chronic bronchitis. This disability causes fatigue and requires evening hours for additional rest and sleep.

11. **Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
   ☑ Yes ☐ No

If "Yes," what medication, medical equipment or other assistance do you use?

two inhalers, anti-histamine, nasal decongestants, emergency room treatment if necessary, antibiotics, cough suppresants

12. **Did you ask your employer for any changes or assistance to do your job because of your disability?**
   ☑ Yes ☐ No

If "Yes," when did you ask? Nov, 2010   How did you ask (verbally or in writing)? verbally & then in writing

Who did you ask? (Provide full name and job title of person) David Banks & Angelo Roxas Vice President, then Angela Hlas & Kim Baker int

Describe the changes or assistance that you asked for: daytime schedule 9a - 6pm for duration of Dr. Chervin's medical treatment

How did your employer respond to your request? Employer allowed the accommodation through March 7, and then the request was denied for dates after March 7, 2011.

3

**13. Are there any witnesses to the alleged discriminatory incidents?  If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |
|---|---|---|---|

A. _Yes. Please See attached._

B. _____

_CLAIM # 41 0311 - 000087_

**14. Have you filed a charge previously on this matter with the EEOC or another agency?** ☒ Yes ☐ No

**15. If you filed a complaint with another agency, provide the name of agency and the date of filing:** _____

_No_

**16. Have you sought help about this situation from a union, an attorney, or any other source?** ☒ Yes ☐ No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

_a Sally Woo —attorney— and I discussed sexual_
_harassment. At this time only consultation has occurred._

Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.  If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws.  **If you do not file a charge of discrimination within the time limits, you will lose your rights.**  If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1.  If you want to file a charge, you should check Box 2.

---

**BOX 1** ☐ I want to talk to an EEOC employee before deciding whether to file a charge.  I understand that by checking this box, I have not filed a charge with the EEOC.  **I also understand that I could lose my rights if I do not file a charge in time.**

---

**BOX 2** ☒ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.  I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

---

_Kara Hewett_
**Signature**

_March 13, 2011_
**Today's Date**

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:

1) FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08). 2) AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)

3) PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge. 4) ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters. 5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

EXHIBIT 19

Equal Employment Opportunity Commission

Employee:    Kara Hewett
Employer:    Barclays
            Ms. Kim Baker
            200 Park Avenue
            New York, New York 10166

Claim Number: 110311-000087

Filing Basis:

1. Reasonable Accommodation of a Disability
2. Sexual Harassment by Multiple Managers
3. Assignment of Work, Training and Unfavorable Hour Discrimination on the Basis of Gender
4. Performance Review Discrimination on the Basis of Disability
5. Compensation Discrimination on the Basis of Disability – Title VII, ADA, Equal Pay Act

Reasonable Accommodation of a Disability

I have chronic, severe asthma and asthma attacks which are treated with two inhalers – an anti-inflammatory inhaler and a rescue fast-acting inhaler.  Also I have contracted bronchitis three times from November, 2010 through February, 2011 including an incident resulting in a short-term disability from work approved by MetLife insurance.

The otolaryngologist treating my asthma, Dr. Chervin, wrote a letter to Barclays' requesting a reasonable accommodation of New York daytime hours only during his treatment of my chronic medical condition, and he discussed my illness with Dr. Kalish, Barclay's physician.   Kim Baker, Barclays Human Resources, has denied the reasonable accommodation letter of Dr. Chervin; however, the letter from Dr. Chervin provides all the information that she specified in a reasonable accommodation request. Appendix A shows the denial of the reasonable accommodation by Kim Baker and a transcript and copy of Dr. Chervin's letter.

The EEOC website contains my exact scenario documented as a reasonable accommodation, but Kim has not approved it.  In my case the hours are daytime hours of 9am to 6pm for the course of the otolaryngologist's treatment, and I am a programmer.
http://www.eeoc.gov/policy/docs/accommodation.html#N_33_  Item 43

> The programmer, due to her disability, requests an adjustment in her work schedule so that she works from 10:00 a.m. - 7:00 p.m. rather than 9:00 a.m. - 6:00 p.m. In this situation, the employer could grant the adjustment in hours because it would not significantly disrupt the operations of the business. The effect of the reasonable accommodation would be to alter when the group worked together and when they performed their individual assignments.

The EEOC website contains another example of a patient with a chronic condition receiving reasonable accommodation for the duration of treatment instead of a fixed calendar date. Dr. Chervin has requested reasonable accommodation in his letter for the duration of his treatment as well.

> An employee with breast cancer is undergoing chemotherapy. As a consequence of the treatment, the employee is subject to fatigue and finds it difficult to keep up with her regular workload. So that she may focus her reduced energy on performing her essential functions, the employer transfers three of her marginal functions to another employee for the duration of the chemotherapy treatments. The second employee is unhappy at being given extra assignments, but the employer determines that the employee can absorb the new assignments with little effect on his ability to perform his own assignments in a timely manner. Since the employer cannot show significant disruption to its operation, there is no undue hardship.

## Sexual Harassment by Multiple Managers

Steve Anderson – Commodities Power Project Manager

As an initial incident of sexual harassment, Steve Anderson, a VP manager in commodities IT at Barclays, invited me to lunch. On many occasions he pressured me for dinner/drink dates including a Broadway show, "Spiderman". Then a couple of weeks later he mailed me a box containing four gifts to my house. One of the gifts was a sexually themed item, specifically a whipped crème dispenser and tips for the dispenser.

Steve found my street address without asking me or retrieving it from me. When I received his package, I was shaking and feared for my physical safety because Steve found my address in a stalker-style fashion. As a professional female seeking to network with a male VP colleague over lunch, his gifts were sexual harassment and seemed like a stalker. An electronic exchange with Steve requested his address for returning the gifts. The package was sent from a UPS store without a return address.

Steve continued his solicitation of dinner/drink dates from me in writing after I requested his return address. The full timeline and text description of the sexual harassment from Steve is in Appendix B.

Yuri Kuzmycz – Commodities Direct Line Manager

As other incidents of sexual harassment, the manager who wrote my review, Yuri Kuzmycz, asked sexually explicit questions such as whether or not I have sex with the men whom I date. He would also use sexually explicit terms like "screw the pooch" referring to casual sexual relationships with partners. Even after reporting sexual harassment, Yuri uses offensive sexual language on the phone in rants. Recently he characterized another London manager, Wayne Healy, as a "dick" in a phone call because Wayne cancelled an interview with only twenty minutes notice.

## Assignment of Work, Training, & Unfavorable Hour Discrimination on the Basis of Gender

Discrimination occurred in the assignment of work on the basis of gender. In my mid-year review, my global manager specifically noted that I should "look for a managerial role" within the organization and weighted People Management as 50% of my performance review objective. Despite the manager's written statement of a managerial role, my managers appraised me with a N/A rating for People Management, and never assigned to me work as people manager. Although my male colleagues were assigned managerial responsibilities, I have never been given equal opportunity as a manager. Employees were assigned to my male colleagues instead of me. One of my male colleagues, Yuri Kuzmycz, has experienced high turnover as a manager, but employees remain assigned to Yuri instead of to me. Also the male managers exclude me from all managerial meetings about hiring plans, compensation, and interviews. From my awareness, all Vice President managers in Commodities Information Technology at Barclays are male, and I am a Vice President female with a managerial role as an objective in my review without any direct or indirect reports. Appendix C provides the exact assignment of managerial responsibility by my global manager, David Banks.

Discrimination occurred in training on the basis of gender. Training documentation for a project assigned to me contained many blank or N/A sections whereas male colleagues had full, complete documentation for their projects. My review assigned me the responsibility of becoming a MARS SME Expert. Much documentation and training material was missing from the MARS documentation as outlined below. As an example of training discrimination on the basis of gender, nostro account project work was assigned to a male exempt technology employee, Abdallah Metwalli, but documentation exists. As another example of training discrimination on the basis of gender, CMDS project work was assigned to a male Vice President, Dave Banks, but documentation exists. As a third example of training discrimination on the basis of gender, MQ Ticket training was available for a project assigned to male exempt technology employees in CIT Support consisting of Vice President and Assistant Vice President colleagues. Appendix D provides the overview of the training discrimination.

Discrimination occurred in unfavorable hours on the basis of gender. Unfavorable night, weekend and holiday hours were assigned to me when male colleagues in other regions were on-duty. Many of the unfavorable hours occurred during my chronic illness when I worked rather than my male colleagues who were on-duty. Paper copies of all phone records are available for review and analysis. At issue is why I was called during evenings, weekends and holidays when male exempt technology employees in other regions were available and staffed for production emergency support. These unfavorable hours contributed to my short-term disability and relapse of bronchitis on multiple occasions from November, 2010 through March, 2011. Appendix E provides the overview of the unfavorable hour discrimination.

## Performance Review Discrimination on the Basis of Disability

Discrimination occurred in Yuri Kuzmycz's performance evaluation on the basis of disability.  In a meeting on March 11, 2011 with my London manager, David Banks, and my line manager, Yuri Kuzmycz, the managers discussed what shortcomings of mine resulted in an overall "Does Not Meet Expectations" rating.  The issues addressed in the meeting were the result of my medical disability requiring a departure at 6pm or budgetary issues that postponed some projects.  None of the shortcomings were for cause or related to my performance as an employee.  Appendix F provides the transcript summary email of the meeting discussion.

My line manager, Yuri Kuzmycz, who wrote my annual review and determined my rating which directly resulted in zero variable compensation, ridiculed me while on short-term disability leave for chronic bronchitis.  Specifically, when I wrote Yuri that I was out of the office due to short-term disability, Yuri ridiculed my absence from work writing that he hoped "daytime television isn't getting too boring".   Appendix G provides the full transcript of the email exchange.  Another manager, Steve Anderson, informed me that annual reviews and compensation was determined while I was on short-term disability.

## Equal Pay Act – Compensation Discrimination on the Basis of Disability and Managerial Ridicule of Employee while on Short-Term Disability

My manager discriminated against me in compensation on the basis of disability compared to male Vice President colleagues in commodities Information Technology.  Specifically Barclays awarded me no variable compensation; however, Barclays generated $18 billion in profits for 2010.  My line manager, Yuri Kuzmycz, who wrote my annual review and determined my rating which directly resulted in zero variable compensation, ridiculed me while on short-term disability leave for chronic bronchitis.  Specifically, when I wrote Yuri that I was out of the office due to short-term disability, Yuri ridiculed my absence from work writing that he hoped "daytime television isn't getting too boring".   Appendix G provides the full transcript of the email exchange.  Another manager, Steve Anderson, informed me that annual reviews and compensation was determined while I was on short-term disability.

**Appendix A – Reasonable Accommodation Correspondence**

**From:** Baker, Kimberly: HR (NYK)
**Sent:** Thursday, March 10, 2011 8:45 PM
**To:** Hewett, Kara: IT (NYK)
**Subject:** Follow up

Kara,

As you know, our process for requesting an accommodation requires that your doctor provide us with a document which includes the request, the reason for the request and the proposed duration of the accommodation.  When we met yesterday, I reminded you that I needed your doctor's request by today so we can evaluate it.  I accommodated your reduced schedule last night without having the required document from your doctor, but I did not receive the accommodation request from you or your doctor today.  We cannot consider your request until it is properly requested and evaluated, so we expect you to do your job and work your normal business hours.  If you would like us to evaluate a new accommodation request, please fax the request to me at 212-548-9014.

Thanks,
Kim




Transcript of Letter from Dr. Chervin:

To Whom It May Concern:
Re: Kara Hewett

Please permit Ms. Hewett to adjust her work schedule to daytime rather than evenings.  She is undergoing treatment for a chronic medical condition and we are trying to regulate her diurnal cycle.  Thank you,

Bradford Chervin

# EAR NOSE & THROAT, ALLERGY,
## & FACIAL PLASTIC SURGERY SPECIALISTS, LLC

Otolaryngology • Head & Neck Surgery • Allergy
Bradford S. Chervin, M.D.

Audiology
Linda Teich Schulman, M.S.,CCC-A

15 February, 2011

To Whom It May Concern;

Re: Kim Hewitt

Please permit Ms. Hewitt to adjust her work schedule to daytime rather than evenings. She is undergoing treatment for a chronic medical condition and we are trying to regulate her diurnal cycle. Thank you,

2600 Post Road • Southport, CT 06890 • Tel: 203.256.3338 • Fax: 203.256.3346
www.DrBChervin.com

## Appendix B – Sexual Harassment by Steve Anderson - Timelines and Documentation

November – December, 2010 – I worked on the "ERCOT Transition to Nodal" project in which Steve Anderson managed the scalar configurations for USCT2.

November, 2010 – Steve and I went to lunch at 'wichcraft.

December, 2010 – Steve asked me on dinner/drink dates including the Broadway show, "Spiderman".

December 22, 2010 – Steve mailed a sexually themed gift, a whipped crème dispenser, along with other gifts to my house.  I never gave him my address, but he obtained it in a stalker fashion.

January 8, 2010 – I asked to return the gifts and requested a return address.

Between Steve Anderson and You

 Kara L Hewett January 8 at 7:01pm Thanks for the Christmas gift, but it was so unnecessary. We've been to lunch and just buddies. I'd actually like to return the gifts, if you could give a return address.

January 10, 2010 – Steve acknowledged that we went to lunch once and provided a return address.

 Steve Anderson January 10 at 12:38am Report Kara,

First off, you are exactly right we went to lunch once, and are just friends. I know it may be hard to believe, but the gifts I sent were freely given and were not intended to create any sense of obligation or to convey a desire for a relationship any deeper than what we have.

The gifts, while personalized were far short of what I consider 'personal' gifts. I was hoping that you would find them 'fun'. Looks like I misjudged things, and I'm sorry for that.

At any rate it's clear that I've made you pretty uncomfortable and I realize that writing your message was probably a difficult thing for you to do, and you'd like to put this all behind you. So if you want to return anything just go ahead and send it to my apartment at the following address:
235 East Eighth Street, Apt 603
Cincinnati, OH 45202

With a little time I hope things can get back to a normal friendship.


Steve

Kara L Hewett January 17 at 5:41pm Report

Hi Steve, Happy MLK Day!  When I first saw the whipped creme dispenser, I wasn't sure what to think.

Kara

January 18, 2010 – Steve asked for a dinner/drink date again.

Steve Anderson January 18 at 12:49pm

Hey Kara,

I have to say, you are the first person to ever wish me a happy MLK day..Thanks! It's always good to hear from you.  I now realize that I put you in a somewhat awkward spot.

Things are going well at RBC...we just submitted our plans and are securing budget for several projects in 2011. There will be occasional trips to NY (I was actually in town last Thu/Fri), so if you're still game for drinks or dinner when the weather's a little warmer, I'd enjoy catching up in person....assuming I don't get back in your doghouse :-0

Take care,

Steve

### Appendix C – Assignment of a Managerial Role by Global Manager – David Banks

Going forward, as she changes to have local line management, I'd look to Kara to continue her development towards a managerial & co-ordination role and leverage her growing network of contacts to raise her profile in the group.

**Appendix D – Training Discrimination**

Assigned Objective:  MARS SME Expert

MARS Available Training:

MARS Overview Training Wiki
- MARS 3120 Training
- MARS 3131 Training

MARS Missing Training:

- MARS 3130 was assigned to me in an email.  I requested training in an email, but the wiki internet training was blank.
- MARS 3160 was assigned to me in an email.  The wiki internet training was blank.
- N/A or Not Available Training: MARS 2120, 2100, 2535, 3005, 3006, 3007, 3105, 3115, 3140, 6500, 6600

Nostro Available Training:

- A Guide to Nostro Balances on the wiki

CMDS Available Training:

- CMDS wiki for market data resets
- CMDS Cruise Control
- CMDS Installer
- CMDS MXExplorer
- CMDS Package Specifications
- CMDS ClearCase Locations
- CMDS Dev Env Web Pages
- CMDS Price Importer
- CMDS Price Exporter

MQ Series Training:

- MQ Series wiki training

## **Appendix E – Unfavorable Hour Discrimination**

Date/Time and Source of Phone Call

| | | |
|---|---|---|
| January 19, 2011 | 8:52 PM | Singapore |
| January 12, 2011 | 8:17 PM | Singapore |
| January 5, 2011 | 9:06 PM | Singapore |
| November 26, 2010 | 11:57 PM | Singapore |
| November 27, 2010 | 12:44 AM | Singapore |
| November 27, 2010 | 11:49 AM | London |
| November 27, 2010 | 12:58 PM | Conference Bridge |
| November 27, 2010 | 1:00 PM | Conference Bridge |
| October 30, 2010 | 4:56 AM | Singapore |
| October 13, 2010 | 9:17 PM | Singapore |
| October 7, 2010 | 9:23 PM | Singapore |
| October 6, 2010 | 7:16 PM | Singapore |
| October 6, 2010 | 6:59 PM | Conference Bridge |
| September 23, 2010 | 11:29 PM | Singapore |
| July 28, 2010 | 10:11 PM | Singapore |
| July 21, 2010 | 10:22 PM | Singapore |
| July 21, 2010 | 9:53 PM | Conference Bridge |
| June 7, 2010 | 8:55 PM | Conference Bridge |
| June 7, 2010 | 8:13 PM | Conference Bridge |
| June 7, 2010 | 6:40 PM | Conference Bridge |
| May 20, 2010 | 9:47 PM | Singapore |
| May17, 2010 | 9:58 PM | Singapore |
| May 17, 2010 | 9:38 PM | Singapore |
| April 28, 2010 | 9:23 PM | Conference Bridge |
| April 28, 2010 | 7:34 PM | Conference Bridge |
| April 22, 2010 | 9:50 PM | Singapore |
| March 30, 2010 | 9:40 PM | Singapore |
| March 30, 2010 | 9:19 PM | Singapore |
| March 24, 2010 | 9:15 PM | Singapore |

## Appendix F – Discrimination in the Performance Review on the Basis of Disability

Notification of Any Performance that Does Not Meet Expectations

Reply |kara.hewett@gmail.com to david.banks, yuri.kuzmycz, Kara, kimberly.baker
show details 7:01 PM (14 hours ago)


Yuri and Dave-

When we met today about 2011 objectives setting, significant time was spent discussing what shortcomings of mine resulted in an overall "Does Not Meet Expectations" rating. In this conversation we agreed to written notification of any shortcoming with possible verbal conversations as well because I was unaware of any issues.  Also the issues addressed in the meeting were the result of my medical disability requiring a departure at 6 pm or budgetary issues and none of the issues were for cause.  Some examples were that Abdallah Metwalli handled a production emergency that occurred at 5:45 pm during my medical accommodation, but my medical accommodation starts at 6 pm. Another example was that my strategic roles and opportunities have been delayed due to resource constraints, and I forwarded an email to Dave and Yuri after the meeting showing where Angelo left my strategic ideas as "takeaways" for the consultant" instead of current projects.  None of the shortcomings addressed in the meeting were related to any cause other than my approved medical accommodation that limits my evening hours or budget constraints.  Therefore I do not understand even now why my overall rating was "Does Not Meets" Expectations.

If you have a different perception or understanding from today's meeting about my "Does Not Meets" expectations rating, please reply.  We have agreed to keep a record of any instance in which I have not met your expectations, particularly for cause.

Kara

**Appendix G – Compensation Discrimination on the Basis of Disability and Managerial Ridicule of Employee on Short-Term Disability**

**January 27, 2010** – Steve Anderson, a Barclays manager, wrote that annual reviews and bonuses were determined during my short-term disability.

Steve Anderson January 27 at 12:55pm Report
I hear that annual reviews, bonuses etc are happening now/soon...Good Luck! .
Kara L Hewett January 27 at 1:14pm Thanks Steve! I've been extremely ill with bacterial bronchitis and on my third round of antibiotics since November. I've been out of the office. I've actually been meaning to send everything back.

**January 25, 2010** – My line manager who wrote my annual review and determined my rating which impacted my compensation, Yuri Kuzmycz, ridicules my absence from work during my short-term disability.

-----Original Message-----
From: Kuzmycz, Yuri: IT (NYK)
Sent: Tuesday, January 25, 2011 1:37 PM
To: Hewett, Kara: IT (NYK); 'kara.hewett@gmail.com'; Banks, David: IT (LDN); Roxas, Angelo: IT (LDN)
Subject: RE: Bronchitis

Kara:

Understood.  Hope you're getting your rest and daytime television isn't getting too boring.  :)

Kind Regards,
Yuri

-----Original Message-----
From: Hewett, Kara: IT (NYK)
Sent: Tuesday, January 25, 2011 8:43 AM
To: Kuzmycz, Yuri: IT (NYK); 'kara.hewett@gmail.com'; Banks, David: IT (LDN); Roxas, Angelo: IT (LDN)
Subject: RE: Bronchitis

Yuri

The doctor is not in the office today.  I anticipate seeing him tomorrow when he's scheduled to return to the office.  I'll email you after his next examination and treatment feedback.

Kara